APPEAL No. 23-4363

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SUNIL KUMAR, Ph.D., PRAVEEN SINHA, Ph.D.,

*Plaintiffs-Appellants*,

v.

DR. JOLENE KOESTER, in her official capacity as Chancellor of
California State University,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:22-CV-07550 / Hon. R. Gary Klausner

## APPELLANTS' REPLY BRIEF

JOHN SHAEFFER
FOX ROTHSCHILD LLP
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
(310) 598-4150
jshaeffer@foxrothschild.com

MICHAEL K. TWERSKY
ALBERTO M. LONGO
FOX ROTHSCHILD LLP
980 Jolly Rd, Suite 110
Blue Bell, PA 19422
(215) 299-2923
mtwersky@foxrothschild.com
alongo@foxrothschild.com

NATHAN WILSON
FOX ROTHSCHILD LLP
434 Fayetteville St, Suite 2800
Raleigh, NC 27601
(919) 719-1269
nwilson@foxrothschild.com

*Attorneys for Plaintiffs Sunil Kumar, Ph.D and Praveen Sinha, Ph.D*

# TABLE OF CONTENTS

INTRODUCTION.................................................................1

STANDARD OF REVIEW....................................................2

ARGUMENT ......................................................................3

I.    The Policy Violates Due Process Because It Causes Plaintiffs to Self-Censor. .........................................................3

    A.    Plaintiffs demonstrated standing due to self-censorship.......3

    B.    Plaintiffs prevail on the merits of their Due Process challenge..................................................................9

II.    CSU Violated the Establishment Clause by Targeting the Hindu Religion and Attempting to Define Hindu Doctrine.....................14

    A.    CSU's arguments fail against the record evidence of hostility toward Hinduism. ................................................14

    1.    CSU's selection of the word caste was tied to its hostility toward Hinduism. ...............................................14

    2.    CSU is incorrect that the Establishment Clause permits "some" hostility toward religion...........................................19

    B.    CSU unconstitutionally attempted to define Hinduism. .....27

    C.    Either CSU's hostility towards Hinduism or CSU's attempts to define Hindu doctrine are sufficient to establish Plaintiffs' standing................................................................33

III.    Plaintiffs' Complaint Alleged a Viable Free Exercise Claim. .......36

CONCLUSION ................................................................43

CERTIFICATE OF COMPLIANCE......................................44

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Right to Life Pol. Action Comm. v. Bayless,*
  320 F.3d 1002 (9th Cir. 2003) ......................................................... 3, 4

*Arizona Students' Ass'n v. Arizona Bd. of Regents,*
  824 F.3d 858 (9th Cir. 2016) ............................................................... 8

*Bd. of Educ. of Kiryas Joel Vill. v. Grumet,*
  512 U.S. 687 (1994) .......................................................................... 20

*Bernhardt v. County of Los Angeles,*
  279 F.3d 862 (9th Cir. 2002) ....................................................... 37, 41

*Bob Jones University v. United States,*
  461 U.S. 574 (1983) ..................................................................... 22, 23

*C.F. v. Capistrano Unified Sch. Dist.,*
  654 F.3d 975 (9th Cir. 2011) ....................................................... 30, 31

*California Parents for the Equalization of Educational*
  *Materials v. Torlakson,*
  973 F.3d 1010 (9th Cir. 2020) ................................................... passim

*Cath. League for Religious & C.R. v. City of S.F.,*
  586 F.3d 1166 (9th Cir. 2009) ........................................................... 20

*Catholic League for Religious and Civil Rights v. City of San*
  *Francisco (Catholic League I),*
  567 F.3d 595 (9th Cir. 2009) ....................................................... 20, 21

*Chaudhry v. Aragón,*
  68 F.4th 1161 (9th Cir. 2023) ........................................................... 18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ................................................................... passim

*Commack Self-Service Kosher Meats, Inc. v. Weiss*,
  294 F.3d 415 (2d Cir. 2002) ....................................................... *passim*

*Davis v. Beason*,
  133 U.S. 333 (1890), *abrogated by Romer v. Evans*, 517
  U.S. 620 (1996).................................................................. 21, 22

*Dodge v. Evergreen Sch. Dist. #114*,
  56 F.4th 767 (9th Cir. 2022) ............................................... 8

*Easley v. Cromartie*,
  532 U.S. 234 (2001)............................................................. 2

*Employment Division v. Smith*,
  494 U.S. 872 (1990)........................................................... 38

*Epperson v. Arkansas*,
  393 U.S. 97 (1968)............................................................. 23

*Everson v. Bd. of Ed. of Ewing Twp.*,
  330 U.S. 1 (1947).............................................................. 24

*Fox v. Washington*,
  949 F.3d 270 (6th Cir. 2020)................................... 34, 37, 41

*In re Howell*,
  731 F.2d 624 (9th Cir. 1984)............................................. 33

*Jock v. Ransom*,
  No. 705-CV-1108, 2007 WL 1879717 (N.D.N.Y. June 28,
  2007), *aff'd*, No. 07-3162-CV, 2009 WL 742193 (2d Cir.
  Mar. 20, 2009) ........................................................... 12, 42

*In re Joshua H.*,
  13 Cal. App. 4th 1734 (1993) ........................................... 10

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022)................................................... *passim*

*Kirshner v. Uniden Corp. of Am.*,
  842 F.2d 1074 (9th Cir. 1988)........................................... 15

*Loving v. Virginia*,
  388 U.S. 1 (1967)................................................................26

*Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*,
  584 U.S. 617 (2018)...........................................................34

*Mirabelli v. Olson*,
  691 F. Supp. 3d 1197 (S.D. Cal. 2023)..............................18

*Monteiro v. Tempe Union High Sch. Dist.*,
  158 F.3d 1022 (9th Cir. 1998).............................................32

*Plessy v. Ferguson*,
  163 U.S. 537 (1896)............................................................26

*Reynolds v. United States*,
  98 U.S. 145 (1878)..............................................................21

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (U.S. 1980)....................................................21

*Riley's Am. Heritage Farms v. Elsasser*,
  32 F.4th 707 (9th Cir. 2022) ................................................8

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*,
  44 F.4th 867 (9th Cir. 2022) ..............................................25

*Saint Francis Coll. v. Al-Khazraji*,
  481 U.S. 604 (1987)............................................................10

*Santa Fe Indep. Sch. Dist. v. Doe*,
  530 U.S. 290 (2000)............................................................20

*Sch. Dist. of Abington Twp., Pa. v. Schempp*,
  374 U.S. 203 (1963) ...........................................................24

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022)............................................................21

*Stinson v. Cnty. of Cook*,
  No. 18-CV-1614, 2020 WL 6870816 (N.D. Ill. Nov. 23,
  2020)....................................................................................12

iv

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................... 3

*Thompson v. Runnels*,
  705 F.3d 1089 (9th Cir. 2013) .......................................... 40

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022) .......................................... 10

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ...................................................... 23

*Van Wyhe v. Reisch*,
  581 F.3d 639 (8th Cir. 2009) ........................................... 34

*Vill. of Freeport v. Barrella*,
  814 F.3d 594 (2d Cir. 2016) ............................................. 10

**Statutes**

18 U.S.C. § 242 ..................................................................... 10

42 U.S.C. § 1981 ................................................................... 10

**Other Authorities**

*Challenge Casteism*, Brown Girl Mag. (Mar. 10, 2020),
  https://browngirlmagazine.com/why-do-we-say-no-to-holi-a-guide-to-challenge-casteism/ (last visited on 08/21/2024) ............... 5

Equality Labs, *Caste in the United States* 9 (2018) .............. 13

12 Hening, *Statutes of Virginia* 84 (1823) ........................... 24

Kalya A. Toney & Stephanie N. Taub, *A Cord of Three Strands* (2023) ................................................................... 35

*Opinion: It's Past Time to Stop Celebrating Robert E. Lee on MLK Day*, Ala. Pol. Rep. (Jan. 17, 2022),
  https://www.alreporter.com/2022/01/17/opinion-its-past-time-to-stop-celebrating-robert-e-lee-on-mlk-day/ (last visited on 08/21/2024) ........................................................ 12

Scott Grinsell, *"The Prejudice of Caste": The Misreading of Justice Harlan and the Ascendency of Anticlassification*, 15 Mich. J. Race & L. 317, 344-49, 361 (2010)....................................26

## INTRODUCTION

If the word "caste" added nothing more to CSU's non-discrimination policy (the "Policy") than clarifying that discrimination based on race, ethnicity, color, or ancestry was prohibited, then no amendment was necessary. The Policy already prohibited discrimination on those bases. And if the word "caste" was intended to laudably prohibit discrimination based on class, socio-economic status, or "systems of social stratification," then there was a religiously and ethnically neutral way for CSU to accomplish that goal. It could have simply used those non-religious, non-ethnic terms to call out well-recognized forms of insidious discrimination that CSU's existing policy seems to leave unaddressed. Instead, CSU chose a word its experts admit is uniquely linked to Hinduism, and thus targeted Hinduism.

Consequently, Plaintiffs are left self-censoring to avoid running afoul of an undefined term (rightly or wrongly tied to their religion) that was added to the Policy in response to Resolutions explicitly targeting Hinduism and Hindus. As enacted, the Policy cannot be enforced without CSU defining religious terms; how else could CSU assess a caste discrimination claim without identifying the caste of the alleged

discriminator and victim? While CSU contends that it added caste to the Policy based on neutral input, the ***only*** evidence in the record are the Resolutions, which focused exclusively on Hinduism and South Asian societies.

CSU's addition of Caste to the Policy is vague enough to violate the Due Process Clause; targets and defines religion in contradiction of the Establishment Clause; and interferes with Plaintiffs' religious observances, contravening the Free Exercise Clause. Plaintiffs should have prevailed on each of these grounds.

## STANDARD OF REVIEW

Contrary to CSU's claim, this Court should apply "extensive review." CSU argues that "extensive review" in *Easley v. Cromartie*, 532 U.S. 234 (2001), was applied because it was the first court of review. (Resp. at 5 n.1). If that is true, then extensive review is warranted here because this Court is the first to review the decision below. Extensive review is further appropriate where "the key evidence consisted primarily of documents and expert testimony." *Easley*, 532 U.S. at 243. Since this was a trial on the briefs, that is precisely the situation here.

## ARGUMENT

### I. The Policy Violates Due Process Because It Causes Plaintiffs to Self-Censor.

CSU added caste to the Policy after its community explicitly associated caste with Hinduism and Hindus. Given that, Plaintiffs have a credible fear the Policy will be uniquely targeted against them based on their religious identification, beliefs and practices.

### A. Plaintiffs demonstrated standing due to self-censorship.

CSU unsuccessfully attempts to distinguish Plaintiffs' self-censorship caselaw by arguing that other plaintiffs demonstrated standing when they refrained from certain actions. (Resp. at 31-33). Here, too, the Policy has caused Plaintiff Kumar to refrain from certain actions; namely, observing religious festivals,[1] publicly discussing Hindu texts, and speaking about his religion. 2-ER-37. Plaintiffs are therefore no different than the *Dreihaus* plaintiffs who "planned" to speak about taxpayer-funded abortion but refrained due to the law at issue, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 154 (2014); or the *Bayless*

---

[1] CSU incorrectly contends that the Policy did not cause Professor Kumar to cease celebrating certain festivals. (Resp. at 27). When asked what the Policy "change[d]" for his beliefs, the first example Professor Kumar gave was "celebrat[ing] some festivals." 2-ER-37.

plaintiffs who "wanted to disseminate advertising without providing twenty-four hour advance notice" except the law prohibited that conduct, *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). Those cases establish that plaintiffs possess standing when they refrain from certain conduct due to a challenged law. That is precisely the argument Plaintiffs make here.

Next, CSU argues that the Policy does not cover Plaintiffs' religious practices, and therefore Plaintiffs lack a credible threat of enforcement. (Resp. at 33-35). This argument repackages the same mistaken reasoning as the District Court. When Plaintiffs testified about not engaging in caste discrimination, they were explaining that they could not treat another person differently based on "caste" because they neither knew what was meant by the term nor believed it was part of their religion. 4-ER-732 ¶ 51; 3-ER-329 ("I don't even know what caste is to start with."). Still, as Plaintiffs further explained, they feared they would be targeted for accusations of discrimination based on the same prejudicial stereotypes that caused caste to be added to the Policy in the first place. 2-ER-37. While Plaintiffs do not believe in caste, the Policy's supporters clearly do, and they explicitly associate it with Hinduism. 3-ER-548; 3-

4

ER-558; *see also, e.g.*, 5-SER-1165 ("[W]e can't let Hindu caste privilege Indian folks gaslight and uphold the oppressive system of caste. Caste is a global issue and it must be abolished.").

Therein lies the danger to Plaintiffs. Because they do not believe caste is part of Hinduism, Plaintiffs risk inadvertently engaging in conduct that those who do believe caste is part of Hinduism would view as casteist. The religious festivals are a prime example. 2-ER-37. Plaintiffs do not believe celebration of these festivals is casteist; however, others do. *See* 5-SER-1162 ("Ho[l]i and Diwali, which are both part of this really oppressive system of caste . . . ."); *see also* 2-ER-37; 5-SER-1159; Equality Labs, *Why Do We Say No to Holi? A Guide to Challenge Casteism*, Brown Girl Mag. (Mar. 10, 2020), https://browngirlmagazine.com/why-do-we-say-no-to-holi-a-guide-to-challenge-casteism/. So if Plaintiffs are observed celebrating those festivals, they run the risk of being charged with caste discrimination, even though Plaintiffs do not believe in caste.

CSU's brief claims that such conduct would not count as caste discrimination. That is no assurance to Plaintiffs when CSU refuses to provide any definition of caste. By purposely leaving it undefined (3-ER-

578, 2-ER-266), Plaintiffs are left to the mercy of students and staff looking to target Hindu practices they view as casteist, while likely eschewing such focus on the conduct of non-Hindu members of the community. *See, e.g.*, 5-SER-1155 (claiming casteism "is a human rights issue" and CSSA "need[ed] to do something about it"); 5-SER-1160 (claiming that it's "critical" to provide "protections for marginalized caste-oppressed communities" from "caste violence"). If CSU had provided a clear, non-manipulatable definition of caste—one not clearly targeted on members of the Hindu faith—it could have assuaged Plaintiffs' vagueness concerns.[2] CSU did not. Consequently, Plaintiffs are left to either censor their religious observances or face the risk of a caste discrimination accusation.

The passion that led to the Policy's amendment shows that Plaintiffs' fears of enforcement are credible. The record reveals a coordinated effort by the CSU community—its student and faculty—who viewed caste discrimination as "a real thing that they were being subjected to." 2-ER-251; *see also* 5-SER-1169 ("[A]ll that matters is that

---

[2] A definition would not remedy the Establishment Clause violations, however. *See infra* Argument § II.

6

they're Dalit students on CSU campuses that are experiencing discrimination, and they must be protected"). CSU admitted that the Policy's supporters were "very vocal," advocated "very loudly, very vocally," and "that they viewed this caste discrimination as a real thing." 2-ER-121. Given the determination displayed by students and staff in their quest to stop alleged caste discrimination, Plaintiffs have a credible fear that they will get swept up in the crusade.

CSU's next argument—that by Plaintiffs' logic, Plaintiffs could have been prosecuted under the old Policy—emphasizes the faultiness of CSU's reasoning. (Resp. at 34). Plaintiffs believe that Hinduism contains a conceptual framework of four varna: Brahmins; Kshatriyas; Vaishyas; and Shudras. 3-ER-330; 3-ER-341. They derive this belief from sacred texts, including the Bhagavad Gita. 3-ER-341. They celebrate holidays that the Policy's supporters consider casteist. *See, e.g.*, 5-SER-1162; 2-ER-37. But CSU students and faculty supporting the Policy defined those varna as the four main caste groups. 3-ER-548; 3-ER-553; 3-ER-559. Now that the Policy prohibits "caste" discrimination, and given CSU's refusal to define that term, there is nothing to stop the Policy's supporters from

7

accusing Plaintiffs' religious observances of violating the Policy. Without the word "caste," Plaintiffs would not have this concern.

Not to worry, CSU contends, its own expert believes that CSU would not punish in a "draconian or punitive" manner, and regardless, the Policy prohibits religious based discrimination. (Resp. at 34-35). But this Court does not need an expert to know that educational institutions frequently exercise their authority to punish disfavored viewpoints, regardless of non-discrimination policies. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 520 (2022) (coach terminated for engaging in prayer that school district found inappropriate); *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 779 (9th Cir. 2022) (principal threatened to fire teacher for wearing a MAGA hat); *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 716 (9th Cir. 2022) (district terminated business relationship with contractor due to "controversial tweets"); *Arizona Students' Ass'n v. Arizona Bd. of Regents*, 824 F.3d 858, 863 (9th Cir. 2016) (funding cut to organization for supporting ballot proposition that state board opposed).

The Policy's vague nature leaves Plaintiffs reasonably fearing punishment for publicly observing their faith, and nothing suggests that

practitioners of other faiths would or could have a similar concern. CSU's paternalistic response that Plaintiffs have nothing to fear ignores the passion that caused the Policy's amendment in the first place. Against that backdrop, Plaintiffs' reasonable decision to self-censor is sufficient for standing.

## B. Plaintiffs prevail on the merits of their Due Process challenge.

For the same reasons Plaintiffs have shown standing, they have also shown they should succeed on the merits.

CSU argues that Plaintiffs have not asserted confusion over the meaning of caste and therefore they lack a claim. (Resp. at 35-36). That is incorrect. Professor Sinha stated "I don't know how to define caste" when asked. 3-ER-329. And CSU's own language expert testified that the question "what is caste" left her "a little bit short of rudderless." 2-ER-131.

Indeed, the record shows that nobody could agree what "caste" meant. 3-ER-544; 2-ER-149; 2-ER-142-43; 2-ER-137; 2-ER-131. The Resolutions define caste as the four varna from Hindu sacred texts, 3-ER-548; 3-ER-553; 3-ER-559, yet others called that an "inaccurate[] portray[al]," 5-SER-1153. Some described it as "a rigid five step basic

pyramid," 5-SER-1154; some said it was "a British colonial concept imposed during the invasion of India," 5-SER-1151; and others claimed it was "not an invention of colonialism" at all, 5-SER-1152. Though many used the word caste, their inability to agree on a definition emphasizes the confusion over the term's meaning.

Nor do CSU's cases involving ethnicity, race and sex help when it comes to the term caste. (*See* Resp. at 36-37). In those cases, courts knew the meaning of challenged words by the robust statutory schemes and case law developed on those subjects. *See In re Joshua H.*, 13 Cal. App. 4th 1734, 1741-42 (1993) (citing 18 U.S.C. § 242); *Vill. of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) (citing 42 U.S.C. §§ 1981; 2000e-2(a)); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 607 (1987) (citing 42 U.S.C. § 1981). And *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) (*see* Resp. at 37-38), rejected a vagueness challenge to the terms "sexual orientation" and "gender identity" because of the extent of law available for how to interpret these now "common legal terms." *Id.* at 1089.

Here, by contrast, there is no well-developed law concerning the meaning of caste or caste discrimination. Plaintiffs are thus left without

any assurance as to how administrators will define this term, which emerges newborn into the modern legal landscape. As CSU's sex discrimination cases demonstrate, the scope of anti-discrimination provisions often expand rapidly. (*See* Resp. at 37 (chronicling how the definition of sex discrimination quickly expanded to include sex stereotyping and same-sex harassment)). Without CSU defining caste, and no agreed upon definition already developed at law, Plaintiffs face a meaningful risk of administrators expanding caste discrimination to cover their religious observances.

The fact that anti-discrimination law can expand so rapidly rebuts CSU's claims that "context" will protect Plaintiffs. CSU, apparently, trusts the term "discrimination" to provide the necessary "context" to stop abuses of the Policy. (Resp. at 38-39). But CSU's own authority illustrates that "discrimination" is constantly evolving. (*See* Resp. at 37). So, while CSU is correct that Plaintiffs would never grade someone differently based on their caste, that does not protect Plaintiffs from discrimination allegations due to celebrating holidays or reading and discussing scripture. CSU can claim in a brief that the Policy "does not bar [P]laintiffs from participating in religious festivals" (Resp. at 28), but

11

that is not some hypothetical fear on Plaintiffs' part. One could easily imagine a faculty member being accused of racial discrimination if he openly celebrated Robert E. Lee on Martin Luther King Jr. Day. *See* Jacob Holmes, *Opinion: It's Past Time to Stop Celebrating Robert E. Lee on MLK Day*, Ala. Pol. Rep. (Jan. 17, 2022), https://www.alreporter.com/2022/01/17/opinion-its-past-time-to-stop-celebrating-robert-e-lee-on-mlk-day/. Why would the same logic not be applied to a Hindu holiday that activist student groups deem casteist? Discrimination accusations have been leveled for less. *See, e.g.*, *Jock v. Ransom*, No. 705-CV-1108, 2007 WL 1879717, at *6 (N.D.N.Y. June 28, 2007), *aff'd*, No. 07-3162-CV, 2009 WL 742193 (2d Cir. Mar. 20, 2009) (plaintiffs alleged that school's celebration of Christmas and Thanksgiving was racial discrimination against them as Mohawks).

One court found that the manner in which a government employer celebrated a holiday supported an allegation of racial discrimination. *Stinson v. Cnty. of Cook*, No. 18-CV-1614, 2020 WL 6870816, at *12 (N.D. Ill. Nov. 23, 2020) (supervisor scolded plaintiff for decorations "celebrating the historical contributions of members of a protected class"). A clear definition could ensure that the concept of caste

discrimination does not get similarly expanded under the Policy. But CSU has refused to do that. 3-ER-578, 2-ER-266. Thus, Plaintiffs' must self-censor or risk allegations against their religious practices.

Looking to the broader "context" only strengthens Plaintiffs' argument. If "caste" was simply another form of race, ethnicity, or color as CSU contends (Resp. at 40), there was no need to amend the Policy. Yet it was amended due to the concerns of individuals who believed caste to be something more—something tied directly to the Hindu religion. 3ER-548, 3-ER-553, 3-ER-559. These same supporters view Plaintiffs' religious holidays as casteist, 5-SER-1162, and are supported by Equality Labs, 5-SER-1156, an organization that seeks to undermine Hinduism. *See, e.g.*, 5-SER-1158; Equality Labs, *Caste in the United States* 9, 14 (2018) (praising the conversion of "Caste-oppressed people out of Hinduism"). Context, therefore, further justifies Plaintiffs' concerns over the Policy's unconstitutional vagueness.

For these reasons, should this Court address the merits of Plaintiffs' vagueness claim, it should hold that the Policy violates Due Process.

13

## II. CSU Violated the Establishment Clause by Targeting the Hindu Religion and Attempting to Define Hindu Doctrine.

CSU's selection of the word caste violated the Establishment Clause in two ways: (1) it resulted from hostility toward the Hindu religion; and (2) it constituted an impermissible attempt to define religious doctrine.

### A. CSU's arguments fail against the record evidence of hostility toward Hinduism.

The *only* record evidence demonstrates caste was added to the Policy to target the Hindu religion, which violates the Establishment Clause.

### 1. CSU's selection of the word caste was tied to its hostility toward Hinduism.

Contrary to CSU's claims, (Resp. at 42), the District Court made no factual finding that the Policy was not hostile towards religion. *See* 1-ER-11-13 (lacking any specific finding to that effect). And the record could not support such a finding because it includes statements by the Policy's supporters that "Caste is a structure of oppression in Hindu society," and defines caste using terms from Hindu scripture. 3-ER-548, 3-ER-553, 3-ER-558-559. That is the *only* evidence in the record of what CSU considered in adding caste to the Policy. 1-SER-0031. CSU's argument—

that such statements do not amount to "hostility" toward Hinduism—is unpersuasive. (Resp. at 42-43). Accusing a religion of being oppressive is clear evidence of hostility toward it.

Nor can it be maintained that the public comments did not evidence hostility toward Hinduism. (*See* Resp. at 43). One speaker accused "members of my caste brethren" of "toxic[]" thinking, 5-SER-1096-97; another discussed "Hindu supremacist[s]," 5-SER-1152; and a third accused "a very particular group of individuals, Hindu[s]" of "withhold[ing] protection from caste-oppressed folks throughout South Asian and throughout the world," 5-SER-1165.

Accepting CSU's contention—which Plaintiffs do not—that systems of stratification exist in multiple religions,[3] (Resp. at 7), serves only to emphasize the Policy's targeted nature. The only religious terms used in the Resolutions were Hindu ones. *See* 3-ER-548-559. Other religions that might include hierarchical systems simply were not the concern of the

---

[3] CSU supports this claim with various U.N. reports and the Indian Constitution, (Resp. Br. at 6-7), which the District Court refused to judicially notice, 1-ER-20 n.1. Thus, this Court must disregard those documents. *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988).

Policy's supporters. CSU is thus incorrect when it asserts that Plaintiffs have "presented no evidence of animus whatsoever." (Resp. at 46).

CSU's arguments that "caste" itself is a neutral word are therefore unpersuasive. While CSU has purposefully not defined caste, the Resolutions had no trouble defining the term, which refer to the four varna discussed in Hindu Scripture—Brahmins, Kshatriyas, Vaishyas, and Shudras. 3-ER-548; 3-ER-553; 3-ER-559. Those Resolutions attribute status of "upper" and "lower" to those varna, and that the "upper" varna perpetuate "socioeconomic inequalities, usurpation of their land," and "brutal violence" against the "lower" varna. 3-ER-548; 3-ER-553; 3-ER-559.

CSU's brief offers a non-Hindu definition, arguing that caste is just another form of "race or ethnicity," and a "descent-based system[] of social stratification." (Resp. at 5, 15). The fact that CSU can come up with a non-Hindu definition for the purposes of litigation only emphasizes the loaded nature of the term. If CSU wanted to only prohibit discrimination based on descent, social class, or systems of social stratification, it could have done so by using those words. Instead, it chose caste, a word CSU's own experts admit "is often associated with Hinduism." 2-ER-149.

16

Ultimately, CSU suffers from a lack of evidence. Of course, the Working Group testified that they did not add caste to the Policy to target Hinduism; to admit otherwise would forfeit the case. But that testimony does not resolve the more important question: why else was caste added? CSU claims that caste was added due to "various inputs" received by the Working Group. (Resp. at 44). Other than the Resolutions, CSU did not identify any other input. Thus, the record's ***only*** explanation of why caste was added to the Policy are statements from those who associate caste with Hinduism. The fact that CSU had religion-neutral words it could have used—but still chose "caste"—only emphasizes the targeted nature of the amendment.

Nor is CSU correct that the public pressure to add caste to the Policy somehow had no effect on the Chancellor and the Working Group. (Resp. at 44-45). While CFA and CSSA do not speak for the Chancellor, CSU loses record support when it argues that it "did not adopt the views of any stakeholder group." (Resp. at 45). CSU's own witness stated "that caste was included" in the Policy "based on the feedback that we were hearing from, you know, our students, our faculty, other groups." 1-SER-0011. A CSU Vice Chancellor likewise admitted that CSU "created a

17

small workgroup" after it "received a number of 'form letters' from both CSU students" as well as "a resolution from the SLO ASI." 1-SER-0031. After the Policy was enacted, CSU's Chancellor "commend[ed] the incredible work and dedication of the students, employees, and other partners whose efforts ensure that our policies align with our bold aspirations." 4-ER-835; *see also Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1220 (S.D. Cal. 2023) (when school admitted to adopting a regulation in response to a FAQ document, plaintiff could rely on the FAQ document to explain the purpose of the regulation).

Findings will not be upheld if they are "implausible, or without support in inferences from the record." *Chaudhry v. Aragón*, 68 F.4th 1161, 1171 (9th Cir. 2023). Here, a finding that caste was added to the Policy for reasons unrelated to Hinduism cannot be supported. CSU's own witnesses admitted to adding caste to the Policy in response to anti-Hindu feedback. 1-SER-0011, 1-SER-0031. As *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 526-27 (1993), shows, (and Amicus agree (Amicus at 15-16)), this Court can look beyond the language of a regulation to ascertain the "'concern' expressed by [stakeholders]" who supported its enaction. It would have been

18

implausible for the city in *Lukumi* to declare that its decision to prohibit ritualistic animal killings was independent from the pressure its constituents exerted. CSU's attempt to make such an argument here is equally unavailing.

The record reveals that CSU added caste to the Policy to target the Hindu religion. Because the "Establishment Clause . . . forbids an official purpose to disapprove of a particular religion," even under the guise of a neutral regulation, *Lukumi*, 508 U.S. at 532, CSU's hostility toward the Hindu religion was unconstitutional.

## 2. CSU is incorrect that the Establishment Clause permits "some" hostility toward religion.

Even if the Policy was amended to target Hinduism, CSU contends that is fine because the Policy is mostly secular and only exhibits "some" hostility toward religion. (Resp. at 46-47). That is incorrect.

First, the fact that a regulation prohibits some non-religious conduct does not save that regulation when it was based on impermissible animus. (*See* Resp. at 46-47). As *Lukumi* holds, a regulation need not be "coextensive" (Resp. at 42) with a particular religion to still target it. The regulations in *Lukumi* applied more broadly than just to Santeria sacrifices, punishing anyone who "unnecessarily or

19

cruelly kills any animal." 508 U.S. at 526 (cleaned up). That did not save the regulations because the intent behind them was "animosity to Santeria adherents."[4] *Id.* at 542. Courts must examine the full context behind a regulation—even when it is facially neutral—to judge whether it was enacted to target religion. (Amicus at 15-16). Here, then, the ability of "caste" to apply more broadly cannot save the Policy when the intent behind it was to target the Hindu religion. Targeting alone renders a regulation unconstitutional. *Id.* at 535.

Defendant's case law does not show otherwise. *Catholic League for Religious and Civil Rights v. City of San Francisco (Catholic League I)*, 567 F.3d 595 (9th Cir. 2009) is not precedential. *See Cath. League for Religious & C.R. v. City of S.F.*, 586 F.3d 1166, 1167 (9th Cir. 2009). The case was redecided en banc, *Catholic League II*, 624 F.3d 1043 (9th 2010), and an equal number of judges split on whether the resolution violated

---

[4] While *Lukumi* involved a Free Exercise challenge, it relied on "the related context of the Establishment Clause" to guide its analysis of religious hostility. *Lukumi*, 508 U.S. at 540; *see also id.* at 532; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 316 (2000); *Bd. of Educ. of Kiryas Joel Vill. v. Grumet*, 512 U.S. 687, 699 (1994). As the Supreme Court held, the Free Exercise and Establishment Clauses "work in tandem." *Kennedy*, 597 U.S. at 523.

the Establishment Clause, *id.* at 1053-54, 1061-62. Thus, no interpretation of the Establishment Clause in *Catholic League I* or *II* is binding. Nor is *Catholic League* persuasive as it was analyzed under the now defunct *Lemon* test. *See Catholic League I*, 567 F.3d at 600.[5]

The Supreme Court's polygamy decisions from centuries prior do not help either. *See Davis v. Beason*, 133 U.S. 333 (1890), *abrogated by Romer v. Evans*, 517 U.S. 620 (1996): *Reynolds v. United States*, 98 U.S. 145 (1878). Those cases did not examine the kinds of hostility arguments that are brought in this case. CSU incorrectly suggests that these cases foreclose arguments that do not appear in them. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563-64 (U.S. 1980) (issue that did not need to be resolved in a previous case becomes one of first impression when ultimately addressed). The Supreme Court also no longer employs the same moralist reasoning that appeared in these

---

[5] Regardless, *Catholic League* involved countervailing First Amendment interests not present here—the government's ability to speak. *See Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). Any infringement on the Establishment Clause that might be permitted when government officials "speak[] out, in their official capacities, on matters of such clearly civil import," *Catholic League II*, 624 F.3d at 1061, does not apply in this case where the government is targeting a religion using a binding regulation.

century-old cases. *See, e.g.*, *Davis*, 133 U.S. at 345 (upholding polygamy ban because "the union for life of one man and one woman" is "the source of all beneficent progress in social and political improvement").

Plaintiffs also incorrectly rely on *Bob Jones University v. United States*, 461 U.S. 574 (1983), a Free Exercise, not Establishment Clause case. *Id.* at 603. Unlike *Lukumi*, there was no evidence in *Bob Jones* that the contested IRS action was taken for the purpose of targeting a particular religion. *Id.* at 592-93, 595. Accordingly, *Bob Jones* has no bearing on CSU's argument that the Establishment Clause permits "some" hostile targeting. Rather, *Bob Jones* emphasizes the respect shown to religion: even though there was no evidence of religious targeting, the Supreme Court still applied strict scrutiny. *Id.* at 604.

To the extent CSU is arguing that strict scrutiny should be applied here too, Appellants agree. The Policy cannot survive that test. First, there is no "fundamental, overriding interest" to justify the Policy. *Id.* (cleaned up). It was enacted due to CSU's hostility towards Hinduism, and "animus toward [a] class" is not a "legitimate state interest[]."[6]

---

[6] The animus aspect should assuage Amicus's concerns over future nondiscrimination policies. (*See* Amicus at 14-15). The government can (and should) enact nondiscrimination policies. But if the "full[] context of

*Romer*, 517 U.S. at 632. Second, if CSU's goal was to prohibit discrimination based on race, ethnicity, ancestry, or class, (Resp. at 40, 49), there was a "less restrictive means" available for doing so. *See Bob Jones*, 461 U.S. at 604 (cleaned up). If, as CSU claims, the Policy already covered caste discrimination, (Resp. at 30), the least restrictive means would be not changing the Policy in the first place.

The historical record only confirms that the Establishment Clause prohibits hostility toward religion. (*See* Resp. at 49-51; Amicus at 3-7). When conducting a history and tradition test, the Supreme Court recently clarified that courts should examine "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). Here, "no historically sound understanding of the Establishment Clause" permits the "government to be hostile to religion." *Kennedy*, 597 U.S. at 541 (cleaned up).

Plaintiffs' Opening Brief identified the key historical analog— James Madison's Memorial and Remonstrance Against Religious

---

the policy" shows that it was actually enacted to target a particular religion, then it falls afoul of the Establishment Clause. (*See* Amicus at 15-16 (citing *Epperson v. Arkansas*, 393 U.S. 97, 107 (1968))).

Assessments. (Opening Br. at 36). The Remonstrance resulted in the Virginia Bill for Religious Liberty, which explicitly prohibited government hostility toward religion: "[N]o man shall . . . be restrained, molested, or burthened" or "otherwise suffer on account of his religious opinions or belief." *See Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 13 (1947) (quoting 12 Hening, *Statutes of Virginia* 84 (1823)). This understanding—that the government cannot be hostile toward a particular religion—continued from the founding through the Fourteenth Amendment's ratification. *See Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 214 (1963) (noting an 1870 opinion that the government must remain "neutral, and, while protecting all, it prefers none, and it disparages none'"). Notably, Amicus agree. (Amicus at 6 ("Founders' understanding" of the First Amendment prohibited the government from "disfavoring or denigrating" any religion)).

CSU contradicts itself when it claims that the history and tradition test applies here, and yet argues that the District Court could use the reasonable observer test. CSU cannot have it both ways. The Supreme Court instituted the history and tradition test when it overruled *Lemon* and its "reasonable observer" test for all interpretations of the

24

Establishment Clause, not just cases involving government endorsement. *Kennedy*, 597 U.S. at 534-36; *see also Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 887-88 (9th Cir. 2022). As the history above shows, any law targeted at a particular religion will violate the Establishment Clause, regardless of whether it has been designed to look facially neutral so as to fool a reasonable observer. The District Court's reliance on the reasonable observer test, therefore, was error.

CSU cannot use nondiscrimination laws which have previously been upheld in the education context to get around this historical principle. (Resp. at 50). First, it is a troubling but true fact that, historically speaking, America did not enforce nondiscrimination provisions in the educational context. More importantly, CSU mistakes the proper historical inquiry. Here, the relevant question is whether history shows that laws targeting a particular religion violate the Establishment Clause. CSU has not identified, and Plaintiffs are unaware of, any nondiscrimination provision enacted out of hostility toward a particular religion that was found to comport with the Establishment Clause. To the contrary, Plaintiffs have shown a historic understanding, stretching back to the founding, that the Establishment

25

Clause prohibits government hostility toward particular religions. CSU would be advocating for a concerning standard if they argued otherwise.

Because the Establishment Clause historically prohibited hostility toward religion, the relevant question is whether CSU was hostile in this case. It is unclear why CSU argues that Justice Harlan's understanding of caste is relevant to that question. (Resp. at 51). Nevertheless, historical evidence shows that at the end of the nineteenth century, the term "caste" was directly associated with the Hindu religion. Scott Grinsell, *"The Prejudice of Caste": The Misreading of Justice Harlan and the Ascendency of Anticlassification*, 15 Mich. J. Race & L. 317, 344-49, 361 (2010). That is precisely why Justice Harlan used the term in *Plessy v. Ferguson*, 163 U.S. 537 (1896). *See* Grinsell, *supra*, at 356, 364. If anything, *Plessy* emphasizes that an incorrect association between Hinduism and caste has existed for over a century.

Finally, CSU's citation to *Loving v. Virginia*, 388 U.S. 1 (1967), only emphasizes the danger of government involvement with religion. In *Loving*, the lower court erred because it adopted a religious position—"Almighty God created the races white, black, yellow, malay and red." *Id.* at 3. The government cannot favor or disfavor a particular religion

without violating the Establishment Clause, as is the case with the Policy.

## B. CSU unconstitutionally attempted to define Hinduism.

CSU makes two arguments to excuse its attempts to define a religious doctrine: (1) that it did not define Hinduism; and (2) even if it did, that would not violate the Establishment Clause. Both points fail.

First, CSU's amendment of the Policy constituted an impermissible attempt to define religious doctrine. If CSU believed, as it now claims (Resp. at 40, 49), that caste was nothing more than race, ethnicity, color, or ancestry, then it would not have amended the Policy because it already prohibited discrimination on those bases. But CSU admitted that it amended the Policy after "bec[oming] aware of student interest in" caste discrimination through, among other things, the Resolutions. 1-SER-0031. Those documents specifically defined caste using terms from Hindu scripture. 3-ER-548; 3-ER-553; 3-ER-559.

CSU further admits that those documents caused it to form the "workgroup," which ultimately advocated adding caste to the Policy. 1-SER-0031. Thus, CSU agreed with the Resolutions' position that the previous version of the Policy was not enough; indeed, officials stated as

27

much. 2-ER-121 ("[W]e took those [concerns] seriously, and we decided to incorporate caste into the policy . . . based on just what we were hearing from these people in our community."). Yet the only evidence as to what caste added to the Policy are the Hindu terms contained in the Resolutions. Even if CSU believed that caste could include other categories, it still plainly believed these Hindu terms represented caste categories. The record evidence thus demonstrates that when CSU adopted these Resolutions' request to prohibit caste discrimination, it also accepted their position that caste corresponded to specific Hindu religious terms. In doing so, CSU—a government entity—defined religious doctrine.

*Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002). reinforces this conclusion. As CSU correctly notes, in *Commack* "the government took sides in an intra-religious debate between Orthodox rabbis and Conservative rabbis." (Resp. at 52). Amicus agree. (Amicus at 17-19). That is precisely what CSU is doing here. Plaintiffs believe that caste is not a part of Hinduism, and that under Hindu doctrine "Brahmins, Kshatriyas, Vaishyas, and Shudras" do not refer to caste categories but rather to different varna. 3-ER-330, 3-ER-

28

341. The Resolutions, meanwhile, believe that "caste is a structure of oppression in Hinduism" and that "Brahmins, Kshatriyas, Vaishyas, and Shudras" refer to the four castes in the Hindu religion. 3-ER-548, 3-ER-553, 3-ER-558-559. By adding caste to the nondiscrimination clause, CSU necessarily rejected the contention that caste was the equivalent of race, ethnicity, and ancestry, and instead accepted CFA and CSSA's position that caste was something more—and that something included the four varna. Those Resolutions are, in fact, the **only** record evidence as to what the Working Group and Chancellor considered in adding caste to the Policy. CSU points to no other record evidence.

*Commack* correctly held that "because the challenged laws interpret 'kosher' as synonymous with the views of one branch, those of Orthodox Judaism, the State has effectively aligned itself with one side of an internal debate within Judaism." 294 F.3d at 426. Similarly, because the Policy interprets caste as including four Hindu terms, terms that Plaintiffs explicitly argue are unrelated to caste, CSU has effectively aligned itself with one side of a debate about Hinduism.

Examining what a prosecution would look like under the Policy further proves this point. In *Commack*, for example, "State authorities

29

could not make a determination that the Yarmeisches' meat did not conform to kosher requirements without first having arrived at an official position on what the kosher requirements are." *Id.* at 428. Here, CSU cannot evaluate a claim of caste discrimination without first ascertaining the castes of the alleged victim and discriminator (e.g. are they Vaishya? Kshatriya? What is a Brahmin?). In making those determinations, CSU "must either interpret religious doctrine or defer to the interpretations of religious officials in reaching its official position." *Id.* at 427. Either way, CSU will be "weigh[ing] the significance and the meaning of disputed religious doctrine." *Id.* (cleaned up). Because CSU cannot enforce a caste discrimination claim without making these types of religious determinations, the Policy is unconstitutional.

*California Parents for the Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010 (9th Cir. 2020), meanwhile, does not hold that the Policy can define religious doctrine as long as it has some other "principal or primary effect." *Id.* at 1022 (quoting *C.F. v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 985-86 (9th Cir. 2011)). For starters, *Torlakson*'s invocation of "principal or primary effect" language comes from the *Lemon* test, which was overruled by *Kennedy*. Under the proper

historical test—addressed above—government hostility alone violates the Establishment Clause.

Moreover, hostility could not have been the principal or primary effect of the materials in *Torlakson* because the record revealed "no expressions of hostility" toward Hinduism. *Id.* at 1020. Here, by contrast, the stakeholder feedback that caused CSU to adopt the Policy was filled with anti-Hindu statements. While an "objective reading of t[he] materials" in *Torlakson* might not have revealed statements "disparaging" to Hinduism, *id.* at 1020-21, here the Policy's supporters called Hinduism and Hindus "supremacist" and "oppressive." 5-SER-1152; 5-SER-1162.

Further, even if a principal or primary effect inquiry was pertinent here, *Torlakson* would not provide the relevant application. In *Torlakson*, the plaintiffs never argued—like Plaintiffs do here—that the curriculum violated the Establishment Clause by attempting to define Hindu doctrine. Instead, when *Torlakson* examined the "principal or primary effect" of the curriculum, it did so in the context of Plaintiffs' argument that the curriculum was hostile to Hinduism. 973 F.3d at 1022 (quoting *Capistrano*, 654 F.3d at 985-86). In contrast, *Commack* directly addresses

31

how the primary effect test applies when the government starts defining religious doctrine. *Commack*, 294 F.3d at 430. Per *Commack,* if a regulation defines religious terms, then one of its primary effects will be to advance or inhibit religion, either of which will violate the Establishment Clause. *Id.* at 430.

*Torlakson* is not analogous for one final reason: it is a school curriculum case. In selecting a school curriculum, state actors will invariably make decisions that upset some parents and students. *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1030 (9th Cir. 1998). Because of this practical reality, courts have limited the ability of "lawsuits against school districts on the basis of the content of literary works to proceed past the complaint stage," otherwise curriculum selection would become untenable. *See id.* Further, curricula decisions do not carry the same type of enforcement consequences as a nondiscrimination policy. Under the Policy, Plaintiffs can lose their jobs, a far more serious consequence then anything alleged by the plaintiffs in *Torlakson*. That is another reason this case is more similar to *Commack*, where the harm alleged was significant monetary penalties, versus

32

*Torlakson*, where the primary harm alleged was simply "offens[e]." 973 F.3d at 1020.

If the Policy does define religion, then CSU cannot save it by arguing that any effect is merely "incidental." (Resp. at 49). When the government engages in the "interpretation of sacred text," its encroachment is far greater than incidental. *Commack*, 294 F.3d at 430. Enforcing the Policy will result in CSU attempting to define terms like Brahmin or Shudra, which come straight from Hindu sacred text, and make assumptions about status based on those identities. Thus, just as in *Commack*, enforcing the Policy in an impermissible violation of the Establishment Clause.

### C. Either CSU's hostility towards Hinduism or CSU's attempts to define Hindu doctrine are sufficient to establish Plaintiffs' standing.

CSU attempts to re-raise a standing challenge that the District Court declined to address. "In most circumstances, a federal appellate court will not consider an issue not passed upon below." *In re Howell*, 731 F.2d 624, 627 (9th Cir. 1984). That alone provides this Court grounds to disregard CSU's argument and remand for the District Court to address. But even on the merits, CSU's standing arguments fail.

33

As outlined above, CSU violated the Establishment Clause by amending the Policy to target Hinduism. Yet CSU argues that this violation was fine because Plaintiffs do not believe caste discrimination is part of Hinduism and so will be unaffected by the Policy. Just because CSU incorrectly stereotyped Hindu doctrine, does not mean that Plaintiffs have not suffered harm. Government targeting of religion causes harm, regardless of whether the government operates from an accurate understanding of that religion's doctrine. *See Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 638 (2018) (the government cannot "pass[] judgment upon or presuppose[] the illegitimacy of religious beliefs and practices"). As Amicus notes, full coercion is not required before an Establishment Clause violation becomes redressable. (Amicus at 10-12).

Here, the government's targeting of Hinduism has caused Plaintiffs to cease practicing their religion openly and live in fear of retaliation. Courts have recognized that is sufficient harm to show standing. *See Van Wyhe v. Reisch*, 581 F.3d 639, 656 (8th Cir. 2009) (inability to celebrate Sukkot substantially burdened inmate's Jewish faith); *Fox v. Washington*, 949 F.3d 270, 279 (6th Cir. 2020) (collecting cases where

34

inability to celebrate religious holidays were found to substantially burden religion). Moreover, "the First Amendment doubly protects religious speech"; meaning that CSU forcing Plaintiffs to self-censor their religious speech violates the First Amendment twice-over. *Kennedy*, 597 U.S. at 523.

Plaintiffs' harm is compounded by CSU's attempts to define Hindu doctrine. Plaintiffs face a government entity that adopted doctrinal definitions that Plaintiffs disagree with, and they live with the threat of those definitions being enforced against them. As *Commack* recognized, that too is a cognizable harm under the Establishment Clause. 204 F.3d at 427.

For all these reasons, CSU's amendment of the Policy violates the Establishment Clause and caused Plaintiffs harm. *See* Kalya A. Toney & Stephanie N. Taub, *A Cord of Three Strands*, 24 Fed. Soc'y Rev. 1, 18 (2023) (recognizing that *Kennedy*'s Establishment Clause concern was whether the government "intends to influence students' [and faculty's] behavior," resulting in behavioral change). This Court should correct the District Court's decision to the contrary.

35

### III. Plaintiffs' Complaint Alleged a Viable Free Exercise Claim.

Contrary to CSU's claims, the Complaint identified how the Policy burdened Plaintiffs' Free Exercise Rights. (Resp. at 16-20). Specifically, the Complaint alleged that the Policy "singled out Hindu employees" for targeting, which was hostile because it was based on "inaccurate stereotypes" that Plaintiffs' religion was "racist and inhumane." 4-ER-706 ¶¶ 56-57. As a result, Plaintiffs alleged they "live[d] with the fear of being disciplined for committing discrimination." 4-ER-710 ¶ 79. "[G]overnment hostility toward religious beliefs is an automatic free exercise violation." Toney & Taub, *supra* at 4-6 (citing *Kennedy*, 597 U.S. at 525 n.1). Plaintiffs' allegations of hostility alone, therefore, state a viable Free Exercise claim.

Plaintiffs also alleged a personal impact. True Plaintiffs do not treat people differently based on caste—a term they do not "believe in." 4-ER-705 ¶ 51 But because the Policy did not "even explain what 'caste' discrimination is," Plaintiffs alleged that they risked being "accused of" practicing caste discrimination based on "stereotypes" of their religion; even if the Plaintiffs personally did not believe they engaged in such discrimination. 4-SER-710 ¶¶ 79-80. The only way for Plaintiffs to

protect themselves from accusations based on stereotypes is to stop practicing their religion. Therefore, drawing "all reasonable inferences in favor of the [plaintiff]" as the trial court "must," *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002) (cleaned up), the Complaint pled that Plaintiffs modified their religious observances due to the Policy's amendment.

That conclusion is borne out in the record. As Professor Kumar testified, he stopped participating in religious festivals to avoid the risk of someone stereotyping him as engaging in caste discrimination under the vague Policy. 2-ER-37. CSU does not appear to contest that the inability to celebrate sacred festivals constitutes a substantial Free Exercise burden. *See Fox*, 949 F.3d at 279.

Because Plaintiffs had to modify their behavior, their Free Exercise claim is distinguishable from *Torlakson*, (*s*ee Resp. at 17-19), where the plaintiffs never alleged that they modified their behavior or faced negative consequence; the only harm they claimed was "offense." 973 F.3d at 1020. Here, by contrast, Plaintiffs alleged that practicing their religion put them at risk of accusations of discrimination, which required them to alter their conduct. *See* 4-SER-710 ¶¶ 79-80.

37

CSU is also incorrect when it claims that the Complaint's allegations show the Policy is neutral. (Resp. at 20). The Complaint explicitly alleged the Policy was not "neutral." 4-ER-710 ¶ 76. Plaintiffs supported that contention with specific averments that the Policy was amended due to "inaccurate stereotypes" of Hinduism as "racist and inhumane." 4-ER-706 ¶ 57. Since the Policy was not neutral, then *Employment Division v. Smith*, 494 U.S. 872 (1990), does not apply. (*See* Resp. at 20).

Nor is it implausible to conclude that CSU adopted the position of those who proposed amending the Policy. (*See* Resp. at 21). It is more implausible to accept CSU's argument that, when the unions representing all of its students and faculty urged the Policy be amended because of the perceived problem of Hindu caste discrimination, and CSU then amended the Policy, that CSU's decision was entirely unrelated to that feedback. CSU concedes that it amended the Policy because it accepted CFA and CSSA's position that caste discrimination was a "real thing." 2-ER-251. CSU points to nothing else in the record as to why it changed the Policy. It is entirely proper to look to evidence of animus in the "'concern' expressed by [stakeholders]." *Lukumi*, 508 U.S. at 526. The

38

District Court's failure to draw that reasonable inference in this case, despite its support in both the Complaint and record evidence, was but one more error requiring reversal.

CSU also incorrectly contends that Plaintiffs never argued that the Free Exercise Clause prohibits the government from defining religion. (Resp. at 22). The Complaint alleged that CSU had impermissibly defined the Hindu religion, and it accompanied that argument with a citation to *Guadalupe* that discussed how government interference in doctrinal decisions violates the Free Exercise Clause. *See* 4-ER-696 ¶ 5. The Complaint then reiterated that the Policy "violates the Free Exercise Clause of the First Amendment by, *inter alia*, defining the contours and practices of the Hindu religion"—specifically, by imputing that a caste system is part of Hinduism. 4-ER-709-10 ¶ 75. That argument also appeared in Plaintiffs' opposition to CSU's Motion to Dismiss, when—in the Free Exercise Section—Plaintiffs identified that "caste as contained in the Policy is a component of the Hindu religion," at least as CSU "defined it." 4-ER-623. Plaintiffs further noted that in defining Hinduism that way, CSU was "associating derogatory and demeaning conduct" with their religion. 4-ER-624.

Moreover, the Complaint alleged how the Policy could not be enforced without CSU defining religious terms, such as what caste the discriminator and the victim belong to. 4-ER-699 ¶ 19. Therefore, as discussed above, CSU would be impermissibly defining religion by determining, and making determinations based on, individuals' castes. See 4-ER-614:15-17; 4-ER-615:11-15 (raising this argument in Plaintiffs' opposition to CSU's motion to dismiss). That too violates the Free Exercise Clause because it involves CSU making religious doctrine determinations, which—in an enforcement action—results directly in adverse consequences for Plaintiffs.

The fact that these arguments have been further fleshed out on appeal does not mean they were not preserved. "[P]arties are not limited to the precise arguments they made below." *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013) (cleaned up). Plaintiff argued to the District Court that CSU's attempts to define caste as part of Hinduism violated the Free Exercise Clause. The District Court's failure to recognize that was reversible error.

Finally, CSU's standing attack does not advance its position. (Resp. at 24). The allegations, summarized above, when viewed in Plaintiffs

40

favor (as they must), show that they have standing to bring a Free Exercise challenge because Plaintiffs must either modify their religious observances or risk enforcement of the Policy against them based on "inaccurate stereotypes." 4-ER-706 ¶ 57. That is a substantial burden. *See Fox*, 949 F.3d at 279. CSU opposes standing with record evidence, which is peculiar given that "on a motion to dismiss for want of standing," appellate courts look to "the complaint." *Bernhardt*, 279 F.3d at 867 (cleaned up). Even so, the record evidence—explained above—only further emphasizes the harm Plaintiffs have suffered because of the Policy's amendment. CSU's brief to this Court may now claim the Policy does not cover Plaintiffs' religious practices, (Resp. at 28), but that is small comfort to Plaintiffs who will have their fate left to the discretion of school administrators should an accusation of caste discrimination be levied against them. 6-SER-1390; 6-SER-1400.

CSU's remaining arguments also fail. Because the only part of the Policy that would support accusations of discrimination against Plaintiffs due to their Hindu practices would be use of the term "caste," Plaintiffs have shown causation. (*See* Resp. at 29). That injury is redressable. Adding caste to the Policy permits students and faculty to levee

accusations against Plaintiffs based on their religious practices, like celebrating holidays and reading sacred texts, given the direct association that others have alleged between these activities and caste. In contrast, it is unlikely that words like "race" or "ethnicity," which are not directly tied to religious activities the way "caste" is, could plausibly support claims against Plaintiffs for their religious activities. *See, e.g.*, *Jock*, 2007 WL 1879717, at \*6 (rejecting claim of that celebration of Christmas holiday constituted racial discrimination). Removing "caste" eliminates that risk to Plaintiffs. That is all Plaintiffs request here.

## CONCLUSION

This Court should reverse the District Court's dismissal of Plaintiffs' Due Process and Free Exercise claim, as well as its decision that Plaintiffs cannot prevail on the Establishment Clause claim.

Dated: August 21, 2024

Respectfully submitted,

*/s/ Michael K. Twersky*
**FOX ROTHSCHILD LLP**

JOHN SHAEFFER
FOX ROTHSCHILD LLP
10250 Constellation Blvd, Suite 900,
Los Angeles, CA 90067
(310) 598-4150
jshaeffer@foxrothschild.com

MICHAEL K. TWERSKY
ALBERTO M. LONGO
FOX ROTHSCHILD LLP
980 Jolly Rd, Suite 110
Blue Bell, PA 19422
(215) 299-2923
mtwersky@foxrothschild.com
alongo@foxrothschild.com

NATHAN WILSON
FOX ROTHSCHILD LLP
434 Fayetteville St, Suite 2800
Raleigh, NC 27601
(919) 719-1269
nwilson@foxrothschild.com

## CERTIFICATE OF COMPLIANCE

This brief contains **8,101 words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief:

[X] complies with the word limit of Cir. R. 32-1 and Cir. R. 32-2(b).

FOX ROTHSCHILD LLP

Dated: August 21, 2024

*/s/ Michael K. Twersky*
Michael K. Twersky

*Attorneys for Plaintiffs-Appellants Sunil Kumar, Ph.D and Praveen Sinha, Ph.D*

44

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2024, I electronically filed the foregoing Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ *Michael K. Twersky*

Michael K. Twersky

*Attorney for Plaintiffs-Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-4363

I am the attorney or self-represented party.

**This brief contains** | 8,101 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☒ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Michael K. Twersky | **Date** | 08/21/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                             *Rev. 12/01/22*